Thank you very much. May it please the Court, Joseph May for the Plaintiff and Appellant M. M. and I would like to reserve three minutes and I will monitor the clock. This case presents another example of an over-aggressive law enforcement response to a mental health call. The consequences of such aggressive responses include potential injury or even death to the person in need of help, injury to the officers, breakdown of the public's trust in law enforcement, and increased costs to taxpayers who ultimately fund the defense of civil lawsuits and the government's payout of settlements and judgments. The District Court in this case erred in finding that merely because it believed M. M.'s injuries weren't serious, Deputies Willett and Crocker used a reasonable amount of force when Deputy Willett put his arm around M. M.'s neck, picked her up in the air, slammed her to the floor, and then two of the deputies put their body weight on top of her back. Where did you get slammed to the floor? I'm not sure that I saw that in the record. Yes, thank you, Your Honor. Twice in Alexis Austin's testimony in the excerpts. And although M. M. didn't use the word slam, she did use the word throw. So throw or slam, to me, a reasonable jury could infer that that's a high level of force used to put somebody quickly on the floor, as opposed to what the deputies testified to, which was they gently lowered her to the floor. It's a sharp contrast. Do you agree that your client was resisting to some extent? And we can debate whether it was active or more passive, but it was resistant. I suppose, I would probably call it verbal noncompliance, but I guess that could be considered passive resistance. I've seen cases that describe sitting there and doing nothing as passive resistance, which is what she was doing. So I would agree that to the extent that's passive resistance. But really, she was just refusing commands to show her wrist. That was it. At some point. But the deputies in this case, in some cases, we see people rush into a room and long negotiation going on here. There appears to be 15 minutes to half an hour of, please show us your wrists. And then the deputies say, now we're going to have to handcuff you. And here's what we're going to do. We're going to put your hands behind your back and force you to your knees, and then you're going to go to the ground. And then later, apparently somebody gets on her back. It appears the only testimony is for 40 seconds. So I guess I want to break those two into those two encounters or those two uses of force. If I were looking in our case law for something that said, taking someone who you need to handcuff because you need to bring her someplace else to the ground in this manner is unconstitutional. Where would I find that case? It's a good question. You know, the case that we relied on was Meredith versus Erath. It wasn't that they needed to take her somewhere. It was that they needed her to stay in place while they searched a building. So I don't know. Yeah. And here's my problem. I'm sympathetic to your argument. I'm also sympathetic to the fact that every time we say there's a constitutional violation, the Supreme Court says to us, point to the case that would have alerted the audience officers to that. And then maybe incorrectly, but summarily reverses us. So I'm trying to find the cases that would that best support your contention that the officers should have known what they were doing violated the Constitution. I appreciate that. Now we're talking about qualified immunity, which was not. Yes. And we can we can affirm on any basis that the record supports. I know I understand the judge found that it didn't violate the Constitution in the first place, but that seems to me to point me back to the fact that a very good district judge doing the research couldn't find a case that supported your position. And so I'm stuck with qualified immunity. Help me pass that hurdle if you can. I appreciate that, Your Honor. I think the first step is figuring out what is the force we're even talking about, because there were so many different versions. And I think the big error the district court made was trying to synthesize those into one coherent story when it wasn't. I think she needed to recognize that the jury could see it the way Ms. Austin saw it, which was the girl being slammed on the floor for not showing her wrist. And if they decided that that was excessive, then the best case that we have is Meredith versus Erath. There are some factual distinctions, of course, there always are. But the rule that came from that case was if you're not threatening the officer and you're just passively resisting, you can't be forcefully thrown down and have your arm twisted behind your back. If anything, this case is a clearer situation because we have a juvenile and mental health distress, whereas in Meredith it was an adult. Does it make a difference? Does it make a difference that in Meredith they really weren't detaining the person to take her somewhere else? They just wanted to keep her from interfering with the search. And here, I think there's no doubt they had the right to bring her to someplace else to be assessed. It doesn't make a difference because we're talking about, remember, we broke this down. We're talking now about slamming somebody on the floor. If your goal is to take somebody to the hospital for evaluation, there's no purpose in slamming her to the floor. If you do accept what the deputies said, that they gently lowered her, I would say yes, that they're probably okay, but they admitted by their own testimony that as they were lowering her, they intentionally applied a pain compliance move. And that's something that's important. The Ninth Circuit in Forrester had a very interesting discussion about using joint holds as pain compliance on passively resisting subjects. And what I would say is that case is obviously different. That case affirmed a defense verdict, but since 1994, I haven't seen a case in the Ninth Circuit that really helps law enforcement understand when is that type of force appropriate and when isn't it. I think if Forrester involved a young girl sitting on her bed in mental crisis, as opposed to a large group of trespassing protesters who outnumbered law enforcement and they were adults, I think the result would be does not apply to the state law claims that we brought. And the judge dismissed the state law claims because she found as a matter of law that there was no excessive force at all. And so I think that this court actually would need to reach the first prong of qualified immunity, because if this court only says there was nothing clearly established about it, then it tosses out the entire case. And my client has never had an opportunity to have recollection. Were the state law claims dismissed with prejudice? Yeah. The state law claims were dismissed along with all the others, because if there's no force, there's no Bain Act violation and there's no battery. That's what the judge said. If there's no excessive force, I should say. And so there's a couple of reasons. Number one is my client has a right to appellate review of the state law claims. They were thrown out summarily based on the first prong. And so this court should reach the first prong so that my client does have her due process right to an appellate review. Secondly, since Forrester, this court hasn't really weighed in. And I think law enforcement would really be benefited, as well as the public, would be benefited by understanding what officers can and cannot do when addressing mentally ill youth who are simply verbally noncompliant. That's a situation that I imagine must occur quite frequently in our society. The cases that we cite give the court the ability to reach prong one in situations that would be beneficial, like addressing an instance that's going to occur again. And so I would strongly urge the court to consider deciding what the contours of this right are so that it does not continue to be unestablished and so that law enforcement officers know what they can and can't do. This would avoid future lawsuits, potentially, if there's a case on point, or it would at least have the ability to avoid this type of thing. And the next time this happens, you know, M.M. was lucky in that these injuries were not extremely severe. If it's throwing a young girl on the floor, one could imagine the next time she might not be so lucky. So that would be my... But can I ask you to focus for a second on what happens once she's on the floor? The only testimony I can find in the record is that they applied pressure to her back while she was being handcuffed. And then she was on the floor, the record seems to say, no more than 40 seconds before being brought to her feet. Again, if we're focusing on qualified immunity or even the unreasonableness of the conduct, it does seem to me that some pressure has to be put on someone while the handcuffs are being put on, assuming the takedown was legal for a second. And so why is 40 seconds on the floor unconstitutional? Well, we cited a case that was exactly 40 seconds of pressure. It was a little bit different. It's called Slater versus Deasy. The panel in that case decided that Drummond, which we cited, made it clearly established that you couldn't exert pressure on somebody's back when they were handcuffed. I understand that she says she couldn't breathe, but were they aware she couldn't breathe? She said it. I think the reasonable inference, and that should go to the jury, the inference is if a girl says, I can't breathe while she's got law enforcement on top of her, why wouldn't they be able to hear that? But I'm trying to get the chronology straight. She says at some point in this, I can't breathe. And they're off her back. She's only on the floor for 40 seconds. So I'm trying to figure out how long they took to get off her back after she said, I can't breathe. It seems to me it couldn't have been much more than a few seconds, right? No, I think the record is that she was down on the floor for more than 40 seconds, but the pressure lasted for 40 seconds. That's my recollection. Actually, I'm looking at the record. The witness was that she was on the floor for no longer than 40 seconds before she was handcuffed and brought to her feet. And so we have a relatively short interval where she's brought to the ground. Some pressure is put on her. And obviously, it's after the pressure is put on her that she says, I can't breathe. And then she's up and on her feet within a relatively short period of time. I'm trying to find something that tells me that course of events, assuming the takedown was legal, is unconstitutional. Right. Well, my recollection of the record was that she was asking for air and that they didn't listen to her. They didn't get off her back. I think that's a fact dispute. If the defendants wanted to remove a tribal issue, I think the very short amount of time of pressure. My recollection of the record is that that's not in there, at least not as precisely as it might need to be to remove this as a tribal issue. But going back to the point about whether it was clearly established, I would direct the court to the Slater versus DZ case and Drummond. In fact, Slater, the suspect didn't even ask for air. And the Ninth Circuit said that Drummond still made it clearly established enough to deny qualified immunity in Slater. And also in Drummond, it involved more significant injuries. Right. I'm sorry, Your Honor. Those cases did involve much more significant injuries and even death. Absolutely. That's right. And I think that the district court focused too much on whether there was injury and what the extent of the injury is. That's a factor sometimes. It's also been held many times in the Ninth Circuit that you can't deny an excessive force claim just because there's no injury. There are many cases where there's been either no injury or de minimis injury. Some of the cases that the defense cites, like, for example, Palarca versus, I think it's Bergano, that was a baton case where the court said, well, if they did use a baton, we would expect a more serious injury. And because none was proven, we're going to say it wasn't a very high level of force. Well, here, a girl was slammed on a carpet. You wouldn't expect to necessarily see bruises or other visible injury in that instance. We do have evidence of injury, though, to her throat. There was bruising on her neck. She had to go to the doctor a couple weeks later, talking about she still couldn't swallow and was having trouble eating. She described the emotional distress, sleeplessness, nervousness that she suffered. You know, I feel like the district judge didn't think these were all that serious, but for a 15-year-old girl being manhandled by three very large deputies, that could be quite traumatic. I was under the impression that the officers feared that she might have a knife, and that might explain some of the actions they took. What's your position on that? Yeah, I appreciate that. I think there's a lot of evidence that would rebut that, including the fact that they let the paramedics get right up close to her and touch her before they ever searched her. If they're concerned about a knife, their own policy dictates, and I put this in the brief and it's in the records, their policy says you search them before you let EMS and paramedics go deal with them. So the concern couldn't have been that big. Second, they said that they took her down on the floor in handcuffs so they could search her because they were afraid of the knife. Well, guess what? They never searched her. So that throws out that argument. If they're saying that's the reason for taking her down, it's belied by their own actions. Thirdly, an officer's statement alone saying that they fear for their safety is not enough. They need objective evidence. Right, but it's not disputed that they did have the right to take her into custody, and she was resisting to some extent. It required some application of force, and that seems to be where the district court was coming from on this. Hard for me to say what the district court's rationale was. I took it that she thought the injury wasn't serious enough, and I'll wrap up with this. I think there were several options. They could have done nothing. They were trained to sometimes do nothing. They could have waited for a mobile crisis response team. They said one was not available. Why didn't they wait? They could have tried to use less forceful means to remove her. All they needed to do was get her to the gurney, try to just take her by the arm and guide her. They do that all the time in law enforcement, but they went right to pain compliance on their version, or slamming, choking, and leaning on top of her under our version. Counsel, you, despite our best efforts, exceeded your time. We'll give you a minute for rebuttal, and let's hear from the county. Good morning, your honors. May it please the court. I'd like to respond to a few of the questions that you posed to counsel, because I think they go right to the key issue here. In terms of the takedown, the issue that presents here, in terms of a fact issue, is zero, because the plaintiff herself testified that she sustained no injury whatsoever from being taken down to the floor. She testified that parts of her body- Why does that bar her claim? Let's assume I'm taken to, somebody uses excessive force on me, but it doesn't injure me. Do I not have a claim? Well, your honor, I think the issue is how you determine whether excessive force has been applied. One of the factors we look at is, of course, the quantum of force that was used. As was the case in Flarka, Judge Gonzales-Rogers looked at the severity of the injury and inferred a minimal amount of force based upon the testimony that the plaintiff herself gave, that she didn't sustain any injury at all from being taken down to the floor. Whether you characterize it as throw or slam, or these more provocative characterizations that cannot transform minimal force into something greater than that. You can't have sort of a magic word standard where if you characterize things using those kinds of terms, then we're going to consider it to be excessive force. And so she was on solid ground in looking at Flarka or even the case in which pressure and pain compliance was used. And the court determined in that case, in which I believe there was a sprained rotator cuff with the injury that was sustained, that that was still a minimal force. Because like in this case, the evidence is undisputed that this is a low level of force on the continuum of options that the officers have to take somebody into custody. Well, I don't think anybody disputes, maybe I'm speaking for counsel out of turn, that they were entitled to put her in handcuffs to take her to the hospital. And at least from my perspective, I'm not troubled by the fact that the way they did it was by putting pressure on her hands and taking her to the ground. The question that counsel raises that troubles me is whether or not they picked her up in the air and slammed her to the ground with her arm around her neck rather than just performing this technique. There seems to be at least some unclarity in the record on that. Tell me on that. Sure, Your Honor. Well, I think to begin with, the only testimony we have around the arm around the neck is from Alexis Austin, who herself said that only that about it. She couldn't, there were no hands around the neck. It was quick and brief and she couldn't say anything else about the arm being around the neck in the course of. Well, but a week later, a week later, the plaintiff is seeking medical attention and has some bruising around the neck and says it came from where an officer put his hand around my neck, right? Thank you, Your Honor, for letting me address that. So I think it's important to note that she was examined by medical personnel immediately after this by the EMTs and at the hospital, right? Because this is a 5150 hold. And so we have her herself saying to the EMTs that she's got no complaints, that she's calm at that time and they're doing an examination and they're not indicating any of these things. That she's saying I was just, you know, someone had an arm on my neck. I couldn't breathe. None of that. She's calm. There's no documented injuries whatsoever in connection with that. And there's evidence in the record that she later on went to the doctor and all the only thing in that record does not corroborate anything except that she repeated a hearsay statement about what happened. There's nothing in that record that says, well, you know, we see some bruises here. We're going to provide some course of treatment for this issue or even just to corroborate that it happened. All we have in that record is just her own hearsay statement. And one, by the way, that she would not make under oath when she was deposed. Never used the word choke in the course of her deposition and neither did anybody else. Can you respond to counsel's point about the state law claims? The suggestion being that if the court were to affirm on the basis of qualified immunity that doesn't resolve claims, what's your answer to that? Well, I believe, you know, if the court affirms, Gonzales-Rogers did, you know, a full evaluation of the state law claims and found that on the grounds that there was no objectively unreasonable force, which is the same standard that we use for applying those claims, that there was no constitutional violation. Well, but I guess missing the question differently. Let's assume we just for the moment that we were to affirm without reaching the first prong of qualified immunity or even reaching it. But unless we do, we don't reach it and we just say, there's no, the case law doesn't clearly establish that the conduct that they were engaging in was unconstitutional. Well, if that's what we did, wouldn't we have to vacate the judgment on the state law claims? Judge Gonzales-Rogers might well decide not to exercise supplemental jurisdiction over them. That's a separate issue. But the immunity analysis doesn't apply to the state law claims, does it? I think that's correct, your honor. That's true. That qualified immunity doesn't apply to state law claims. I think that's an accurate statement. So that if we were to, now if we were to affirm on the basis that the judge did, obviously that would, I think your opponent doesn't disagree, that would dispose of the state law claims too. But if we did it on qualified immunity, we'd have to remand to state law claims. That's how I understand the law, your honor. But let me say this. I think that in terms of the constitutional analysis, without even reaching qualified immunity, Judge Gonzales-Rogers was correct. And she, you know, to go to the other issues that were raised in the course of counsel's presentation, to move to beyond the takedown to the period on the floor. The critical issue I see in the record is that the plaintiff herself makes quite clear that any force that was applied while she was on the floor occurred prior to being handcuffed. All the case law that plaintiff presents around excessive force being found under those circumstances, especially in the Slater case and in the others, involves situations where the force is applied after someone's handcuffing. I was asking counsel that question. I was looking at his statement of facts, of undisputed facts. And I thought that there was no dispute between the two of you looking at those statements about what happened when she was on the floor, which is that the pressure was released shortly after she was handcuffed and she was brought to her feet promptly thereafter. Am I reading the record correctly on that? You are, Your Honor. And the plaintiff herself testified that after she was handcuffed, she was, using her own words, escorted to the ambulance with that incident. So the handcuffs themselves run very briefly before she reached the gurney. But in terms of being on the floor, this period of time where the testimony establishes only that someone's knee was on her lower back or on her butt, as she termed it, at some point during that time, it doesn't indicate that it was on there for 40 seconds continuously. But even if it did, this all is prior to being handcuffed. The kind of cases that they have presented involve situations where a degree of force is applied after a subject is restrained, after they've surrendered, and after they, in many cases, are already handcuffed or hobbled, as in the Slater case multiple times, or in the Drummond case, where they're asphyxiated to death after being already completely restrained. None of that happened here, obviously, in terms of the level of force, but even any force. Because by the plaintiff's own testimony, he was handcuffed and taken and brought to her feet and walked to the ambulance, at which point she told the EMTs that she was calm and had no complaints. And so there isn't a factual issue for anyone to resolve around that issue. This, she herself says, while she was on the floor, that she was resisting. And again, after she was handcuffed, she's taken, brought to her feet, and walked to the ambulance without any issue. Can we, can you help me again with the record, returning to the, what I'll call the takedown, and the events that lead up to it. Why was it necessary to handcuff her and take her down? Or why was it, why was it not unconstitutional to do that, I suppose, is the better question. Right, well, thank you, Your Honor. Well, I think, first of all, there's broad agreement and no that they had probable cause to take her into custody under 5150 and to go to the hospital. So they have, you're authorized to use reasonable force to take her to custody right there, right? So irrespective of the level of resistance, some amount of physical coercion is permitted for them to take her. Did they ask her whether she would consent to being handcuffed? I understand that she's belligerent. She says, fuck you to the, to somebody, and that she won't show her wrists. But did they ask her whether she would consent to being handcuffed? But I think the record establishes that they asked her many times to show her wrists, and that they told her they were going to take her to the hospital, and that she was utterly non-compliant throughout that. I agree on all those statements. I asked a very specific question. Did they ask her whether or not she would consent to being handcuffed? Put out your wrists or put them behind you so we can handcuff you. No, Your Honor. So Alexis Dawson testified that she herself was pleading with the plaintiff to get onto the floor so that they could, so that she could be handcuffed. And so I think it was clear that that was what they intended to do. They gave her a warning and told her precisely what they intended to do. I do also think that the record is clear that because she was concealing her wrists the entire time, and the fear that everyone had was that she may have cut herself, she could still have within her possession, at least at a risk, the means to, the means by which she may have cut herself, which also could present a risk, not just to her, but to the deputies who were trying to take her to the custody. Yeah, and I guess, I guess we're missing each other here, so I want to be specific. I understand that one could reasonably take her refusal to show her wrists as, as resistance to having, being handcuffed because you have to handcuff the wrists. But I'm just asking whether or not the officers ever said before they began the maneuver, if you'll just put out your wrists and let us handcuff you, we won't have to do this. Well, Your Honor, I, you know, I think it's not clear from the record. I think that they made that explicit request. But what we do know is that she was resistant to non-compliance to all the requests that they did make, and that they did give her an opportunity and a warning after 15 minutes of discussion before they applied any force at all. That is quite clear from the record. I thought they did tell her they were going to handcuff her. I thought that was part of what they explained to her, was that if you can't come with us, we are going to have to take you and, and put handcuffs on you, among other things. Right. Well, I believe that they did explain that they were going to handcuff her on the floor. That's what they were intended to do. Here was the warning for how that was going to take place, if she did not comply. Yeah, I understood there was a warning. And I was just trying to figure out whether they said, well, if you'll just let us handcuff you now, we won't have to do that. But I take it there's no such statement in the record. Right. Your Honor, the other thing I wanted to address is the Meredith case that the council mentioned in terms of the takedown and the force applied, which as Judge Gonzales-Rogers discussed, is quite different from this case in many respects. And one critical one in that case was the use of force incident to execution of the search warrant, where openly they determined that no force was appropriate at all. No force was reasonable, let alone tightly handcuffing this woman for 30 minutes on the couch. And that was really the focus of rather than itself. But in any case here, we have a situation in which clearly disputed that the officers have authority to use reasonable force to take the plaintiff here into custody. The target of the force and some level of force to accomplish that. If I could ask you, why isn't there like a genuine issue of material fact with respect to the minimal force that was used? You hear the plaintiff talk about being slammed down and thrown down. And that was excessive. And the officers taking position, no, we didn't do that. We laid gently down. Why isn't that itself a genuine issue? Your Honor, because when you break down these levels of force, you have the instance of injury at all, right? There's a dispute about any injury at all from the takedown itself. Then you have an issue about whether there's a bruise that apparently was too minuscule to appear in a photograph and therefore isn't part of the record. And the only objective evidence of any kind of injury at all is a bruise on a wrist, either from the handcuffs and the application of force to put them on. And they were on very briefly. So the idea that because of subjective characterizations of the force or subjective characterizations of injuries that required no treatment, evaluation whatsoever, that we need a jury to decide whether that bruise is indicative of excessive force. I think it's not supported by the law, especially when you're talking about levels of force that are already low, that it was appropriate for the court to infer a minimal level of force from the entire absence of injuries or in some instances only a bruise. That's the only objective indication of any injury. And there really isn't a research around this sort of situation where excessive force was found. This level of force for entirely subjective injuries that were treated. Counsel, thank you. You've gone over and let's put a minute back up on the board for Appellant's counsel so you can have some time for rebuttal. Thank you, Your Honor. If I could just very briefly hit some points. The department policy actually says you're not supposed to handcuff juveniles if they're not actively resisting or combative. The policy also says that pain compliance is only for active resistance. And those are relevant in determining whether it's a reasonable use of force. Also relevant, maybe not dispositive, but relevant in the qualified immunity analysis. Quick point, the fuck you was disputed. Will is the only one who heard it. Everybody else denied it. Austin said that MM twice agreed to voluntarily walk out of the house and that Willett didn't let her do that as an option. So there's another way they could have avoided taking her down or throwing her down. The whole thing about not reporting a neck injury the same day. There was bruising viewed on her neck by Ms. Austin the same day. The photograph, for whatever reason, didn't pick it up. Could have been the lighting. The fact that she didn't report it. There's adrenaline going when she's in that ambulance. She's just been thrown around by deputies. There's a lot of plausible explanations for why she wouldn't have reported it. And then finally, on the state law claim, again, I would urge the court to take this opportunity to decide what the right is in this case. What can law enforcement officers do in this situation? We're going to need to know. I think it will help everybody. Thank you, counsel, and thank both counsel for their arguments. This case will be submitted. Thank you.
judges: Hurwitz, Bress, Corker